AO 91 (Rev. 11/11)   Criminal Complaint

## UNITED STATES DISTRICT COURT
for the
Northern District of California

**FILED**

Apr 09 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| KEYLA RAPALO | ) Case No.   3:25-mj-70414 MAG |
| | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   Nov. 25, 2024 to March 6, 2025   in the county of   San Francisco   in the   Northern   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to commit identity fraud in violation of 18 U.S.C. § 1028(a)(7) |

This criminal complaint is based on these facts:

See attached affidavit of HSI Special Agent Robert Sands

☑ Continued on the attached sheet.

_____
/s/
_Complainant's signature_

ROBERT SANDS, Special Agent, HSI
_Printed name and title_

Approved as to form   Richard Ewenstein
AUSA   RE

Sworn to before me by telephone.

Date:   04/09/2025

_____
_Judge's signature_

City and state:   San Francisco, CA

HON. LISA CISNEROS, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Robert Sands, a Special Agent with Homeland Security Investigations (HSI), being duly sworn, depose and state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application under Rules 3, 4, and 4.1 of the Federal Rules of Criminal Procedure for the attached Complaint and arrest warrant authorizing the arrest of Keyla Rapalo ("RAPALO") for engaging in conspiracy to commit identity theft in violation of Title 18 U.S.C. §§ 371 and 1028(a)(7) from on or about November 25, 2024, through March 6, 2024, in the Northern District of California and elsewhere.  Based on my training, experience, and the investigation to date, there is probable cause to believe the individual identified above has committed the listed violation of the federal statutes as described in the complaint.

2. In sum, and as set forth in detail below, RAPALO knowingly engaged in a conspiracy to commit identity theft by participating in a scheme to accept a delivery of a laptop computer sent via FedEx from San Francisco, California to North Carolina.  The laptop computer was sent to identity theft victim "D.W.," and RAPALO knowingly signed for that laptop using the victim's name after discussing the plan to do so with at least one co-conspirator.  RAPALO then set the computer up on a network to assist in the facilitation of a fraudulent IT remote work scheme in which RAPALO and her unindicted co-conspirators received pay for work performed by unindicted co-conspirators under D.W.'s stolen identity.  RAPALO's actions, admissions in a Mirandized interview, and statements in a text chat with an unindicted co-conspirator establish her knowing participation in the conspiracy to commit identity theft with the intent to defraud a company that believed it had hired the true D.W. to do remote work.

1

3.    The facts set forth in this Affidavit are known to me as a result of my participation in this investigation, from information provided to me by other law enforcement officers and from records, documents, and other evidence obtained during this investigation.  Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested complaint and arrest warrant, I have not included every fact known to me concerning this investigation, but rather those facts that I believe are sufficient to establish probable cause to obtain a complaint and arrest warrant.

4.    I base my statements in this affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and law enforcement officers including through their reports, information provided by video and photographic evidence, and information provided by records and databases.  I believe these sources to be reliable.  Where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted.  This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.

### AFFIANT BACKGROUND

5.    I am a Special Agent with HSI, which is a department under the United States Department of Homeland Security.  I am currently assigned to the San Francisco Field Office where I have been a Special Agent with HSI since 2017.  I have twenty years of law enforcement experience in both criminal and administrative investigations.  Prior to working for HSI, I was a Deportation Officer and Immigration Enforcement Agent for Immigration and Customs Enforcement, Enforcement and Removal Operations (ERO) in Detroit, Michigan and prior to

2

working for ERO, I was a Customs and Border Protection Officer with United States Customs and Border Protection in San Francisco, California.  I also worked as a Task Force Officer with Homeland Security Investigations in Detroit, Michigan, for over two years.  I have a bachelor's degree in Criminal Justice from Michigan State University.  I successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) and HSI's Special Agent Training course at the FLETC.

6.    I have personally participated in the investigation discussed in this affidavit.  I am familiar with the facts and circumstances of the investigation through my personal participation.  I have also learned other things about this investigation from fellow law enforcement officers and agents.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a HSI agent or task force officer, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

## APPLICABLE STATUTES

7.    Title 18, United States Code, Section 371 provides, in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

8.    Title 18, United States Code, Section 1028(a)(7) provides, in relevant part, that a person who does the following is guilty of a felony:

> knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in

3

connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law[.]

A "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual. 18 U.S.C. § 1028(d)(7).

## FACTS SUPPORTING PROBABLE CAUSE

### Background on Remote IT Workers Schemes

9. Through my training and experience, I have become familiar with a type of scheme to defraud known as a "remote worker scheme." The typical pattern seen with schemes of this type is that individuals, usually located overseas, use remote desktop software to access U.S.-based computers so that it appears they were performing work from U.S.-based locations. Remote desktop software applications allow a computer to remotely run another computer's desktop environment. The remote connection between devices is established and maintained through the Internet.

10. The individuals perpetrating these schemes (the "remote actors") often obfuscate their identities, locations, and nationality by using virtual private networks ("VPNs") and virtual private servers ("VPSs"). A VPN is a network of dedicated servers, run by a VPN service, that encrypt a user's Internet traffic; that is, the information sent from the user's computer across the Internet. VPN services maintain servers in different locations worldwide, enabling their users to mask their true geolocation by accessing the Internet through a VPN that is in a different location. VPSs are virtual machines that provide virtualized server resources on a physical server that is shared with other users.

11. The remote actors are often aided in this fraud by both U.S. and foreign facilitators. U.S.-based enablers provide a U.S. address for victim companies to send laptop computers and

4

other devices, enabling the remote actors to circumvent controls companies have in place to prevent hiring illicit, overseas workers and to prevent unauthorized access or damage to company networks.  After receiving a device, the U.S. enablers use credentials provided by either the remote actors or the victim company to log in to the device and install remote access software without authorization.  Sometimes enablers allow the remote actors to apply for remote IT positions using their names and identity documents.  Enablers perform these activities in exchange for a fee, which is typically paid to them through online money transfer and digital payment services.

**Company 1 Reports Fraudulent Employment Scheme**

12.  On January 22, 2025, Homeland Security Investigations San Francisco (HSI-SF) received information from Company 1, a software company headquartered in San Francisco, about a possible fraudulent employment scheme. An employee from Company 1 notified HSI-SF that they were contacted by the victim D.W., in early January 2025, who claimed that Company 1 had hired someone who had used D.W.'s identity and that person was drawing a salary in his name.

13.  Company 1 conducted an internal investigation and determined that the individual hired by Company 1 who was using D.W.'s identity was not D.W., and that the imposter (hereinafter, "Fake D.W." had used D.W.'s personally identifiable information to gain employment and a salary at Company 1.  Company 1 had hired Fake D.W. as a software engineer working entirely remotely.  Company 1 terminated Fake D.W.'s employment after the internal investigation.

14.  Company 1 provided HSI-SF with information about Fake D.W., including a photograph of the California driver's license that Fake D.W. had provided to Company 1;

5

three bank accounts used by Fake D.W., and multiple addresses that Fake Duff D.W. used. These addresses included one address in San Francisco and two addresses in Goldsboro, North Carolina, which will be referred to as "Goldsboro Address 1" and "Goldsboro Address 2."[1]

15.  A comparison of D.W.'s driver's license photo and the driver's license photo that Fake D.W. submitted to Company 1 establish that they are both males of similar age and ethnic background, but the two images are of different people.

16.  Company 1 confirmed it sent a Company 1 laptop to Fake D.W. at Goldsboro Address 1 and the tracking number confirmed the package as delivered and signed for by D.W. (The signature was "D." followed by "D.W.'s" full surname written out.)

**HSI-SF Interviews D.W.**

17.  On January 30, 2025, HSI-SF agents interviewed D.W. at his residence in San Francisco.  During the interview, D.W. told agents that he had not given out his personally identifiable information to another person and had not given anyone permission to use his personally identifiable information.  D.W. stated that he never lived in North Carolina.

18.  D.W. told the agents that he first became concerned when he found evidence of 401K retirement accounts opened in his name for Company 1.  D.W. told agents that he ran an Equifax "The Work Number" report and noticed that he was showing work history at Company 1, Company 2, and Company 3, all software companies in the San Francisco Bay Area.  D.W. said he had not worked for these companies.  D.W. also told agents that Fake D.W. had drawn over $42,440 USD in salary from Companies 1, 2, and 3, and that D.W. was concerned about the tax implications of the money.  D.W. provided agents with

---

[1]  These addresses are known to me.

emails, documents and screenshots of his attempts to rectify the apparent identity theft. Among the documents was "The Work Number" report that indicated that Fake D.W. had received over $42,440 USD in payments from Companies 1, 2, and 3, and that his salary at Company 1 was $215,000 per year.

19. During the interview, D.W. told agents he filed police reports about his stolen identity and provided screen shots of the reports to the agents. D.W. showed the agents his communications with Company 1, told agents that his research indicated that Fake D.W. was no longer employed at Company 2, and that he had reached out to Company 3, where he said he believed Fake D.W. was still employed.

20. During the interview, D.W. showed agents his California driver's license. As noted above, the photograph on D.W.'s California driver's license did not match the photograph on the California driver's license provided by Fake D.W. to Company 1.

21. During the Interview, agents asked D.W. about the bank accounts provided by Fake D.W. by Company 1, and D.W. said he was unfamiliar with the accounts.

**D.W. Reports Use of His Identity to Gain Employment at Company 4**

22. On February 13, 2025, D.W. contacted HSI-SF and notified agents that he had found 401k information at Fidelity (a financial institution) in his name indicating that Fake D.W. was employed at Company 4, another software company headquartered in San Francisco, CA.

**Fake D.W.'s Employment at Company 4**

23. On February 14, 2025, Company 4 contacted HSI-SF and reported the fraudulent use of D.W.'s identity to gain employment at the Company. Company 4 confirmed that it had hired a person who used D.W.'s identity for an entirely remote position on their web development team. Company 4 stated it had determined that the person they hired was not

7

D.W. after the real D.W. had contacted Company 4.

24.   Company 4 told HSI-SF that it had conducted the interview with Fake D.W. for the web development job remotely, but that some of the Company 4 employees who had conducted the interview were in San Francisco at the time.  Company 4 reported that Fake D.W. started working at the company, entirely remotely, on February 10, 2025.  Company 4 stated that it sent Fake D.W. a Company 4 laptop to Goldsboro Address 2 via FedEx, which was signed for under the name "J. [D.W.'s true last name]."  I am aware from my investigation that D.W. often goes by the first name "Jeff" in place of his legal first name. During his first week at Company 4, Fake D.W. appeared on video via Zoom and was the same person who had interviewed for the position.

25.   Company 4 stated that on February 15, 2025, D.W. contacted Company 4 and reported the unauthorized use of his identity.  The same day, Company 4 revoked Fake D.W.'s access to Company 4's systems.

26.   Company 4 instructed Fake D.W. to send his Company 4 laptop back to Company 4, which he did, and told him that it would ship him a new laptop.

**RAPALO Falsely Signs for the Company 4 Laptop Under D.W.'s Name**

27.    On February 21, 2025, with the consent of Company 4, HSI-SF sent a laptop issued by Company 4[2] to "D.W." at Goldsboro Address 2, the same address at which Company 4 had sent the first Company 4 laptop.  As explained below, the investigation soon revealed that address to be RAPALO's residence. The box used to ship the laptop contained a covert tracker, inserted pursuant to a search warrant issued on February 18,

---

[2] The new laptop provided by Company 4 was a blank laptop with no additional software installed.

2025, by the Honorable Laurel Beeler, Magistrate Judge, Northern District of California. Dkt. No. 3:25-mj-70188 LB. The Company 4 laptop was sent via FedEx with tracking number 7721 8265 1432.

28. On February 24, 2025, at approximately 2:20 p.m. Eastern time, FedEx delivered the package containing the Company 4 laptop to Goldsboro Address 2. HSI monitored the tracking device and conducted physical surveillance at the time of delivery and observed a female subject, later confirmed to be RAPALO, receive the delivery from FedEx. RAPALO signed for and took possession of the package containing the Company 4 laptop.

29. FedEx tracked this package with tracking number with a tracking number ending in 1432, and a search for that tracking number showed that it was signed for by "R Ropel." The FedEx data noted a delivery time consistent with HSI's surveillance of the delivery.

30. Company 4 provided HSI additional proof of delivery from FedEx. A digital touch signature that reads "Jeff W." is present in the proof of delivery along with the text R. Ropel (see Figure 1 below).



Figure 1 – FedEx Proof of Delivery Touch Signature

31. Based on my knowledge, and conversations with a FedEx delivery employee, the digital touch signature is provided by the individual that signs for the package.

9

Additionally, the delivery person asks the recipient for his or her name, and the delivery person types the name given into their device. Thus, I believe that RAPALO signed the name "Jeff W" with her finger on the digital touchscreen and likely gave the name "R. Ropel" or a similar sounding name to the FedEx employee delivering the package to type in.

**A Search Warrant Execution at Goldsboro Address 2 Discovers a Laptop Farm for Remote Work**

32.    On March 6, 2025, HSI executed a search warrant at Goldsboro Address 2 pursuant to a federal search warrant issued on March 05, 2025, by the Honorable Robert T. Numbers II, United States Magistrate Judge for the United States District Court for the Eastern District of North Carolina. Dkt. No. 5:25-mj-1279 RN (the "North Carolina search warrant").

33.    RAPALO was present in the home at the time agents executed the North Carolina search warrant.

34.    During execution of the North Carolina search warrant, HSI discovered thirteen laptop computers powered on and configured for remote access. Agents observed numerous computers actively being operated by remote users while the agents were present. The laptop HSI sent, purportedly from Company 4, with the location tracker was

10

also present at the residence.



Figure 2 – Active Laptop Farm

35.    After examination, HSI attributed some of the laptops in the residence to victim D.W.'s identity and Companies 3 and 4, which had reported fraudulent employment in victim D.W.'s identity.  Some laptops were labeled with a note that provided a user login and password for the computer to facilitate remote access, or that identified with which company the laptop was associated.  None of the usernames appearing on the notes featured RAPALO's own name or any apparent combination of her initials or first and/or surnames.  Numerous suspected victim company names or identities connected to suspected fraudulent employment were labeled on the laptops or visible on the login screens.

36.    During the execution of this search warrant, HSI special agents observed devices attached to at least some of these computers, including TinyPilots or other similar Keyboard, Video, Mouse ("KVM") switch devices.  TinyPilots are devices that function as a KVM (Keyboard, Video, Mouse) over IP, enabling users to control a computer or computers as if they were physically present.  TinyPilots typically connect to a computer's HDMI and USB ports.  TinyPilots capture video output and send it over the network while

11

allowing keyboard and mouse input to be sent back to the computer.

**RAPALO's Statements to Agents Confirm That She Conspired With Others**

37.     RAPALO confirmed to interviewing HSI agents she was fluent in English. After being advised of her *Miranda* rights, RAPALO consented to an interview.

38.     During the interview, RAPALO said that a man named "Brandon" works "cyber." RAPALO continued, saying that she receives the laptops, and "Brandon" tells RAPALO to connect them to the Wi-Fi in her residence. RAPALO said that she has the laptops turned on at her residence until "Brandon" tells her to turn them off. RAPALO said she did not know what he does with them and that she receives $250 a month for each laptop. RAPALO told agents she also communicated with a man named "Jeffrey" about the laptops.

39.     During the interview, RAPALO told HSI agents that the only occupants of the home were RAPALO, her husband (who is neither "Brandon" nor "Jeffrey"), and her infant son.

40.     RAPALO told HSI agents that she received the laptop sent by Company 4 and had signed "Jeff W" when she took possession of it from FedEx. She admitted that she configured the laptop for remote access like the other laptops found in her home.

**RAPALO's Skype Chat With "Jeffrey" In Furtherance of the Conspiracy**

41.     HSI agents found a text conversation in the Skype[3] application on RAPALO's phone from November 25, 2024, until late February 2025, in which she communicated with an individual claiming to be named "Jeffrey." In that conversation, RAPALO

---

[3] Through my training and experience, I know that Skype is a computer application that allows users to communicate with each other in various ways, including through text chats and video chats.

discussed buying a TinyPilot device (explained above), laptop computers, increasing the speed of RAPALO's internet, pictures of ledgers for money RAPALO claims she was owed by "Jeffrey," purchased computer cables, and instructions for setting up the laptops for remote access using TinyPilots or KVM switches.

42.     On January 15 and January 22, 2025, "Jeffrey" and RAPALO discussed creating a counterfeit driver's license with RAPALO's husband's face for $200 so they could open a bank account at an online bank and avoid a traditional bank. RAPALO ultimately declined to have the counterfeit license made after telling "Jeffrey" that her husband expressed concerns about his face being used.

43.     On February 11, 2025, RAPALO and "Jeffrey" discussed RAPALO's concerns over a raid and arrest of an associate of hers in another jurisdiction who was operating a similar laptop farm.  They discussed moving the laptops at RAPALO's address to another location.  RAPALO initially wanted to send the laptops back expresses fear over being arrested.  RAPALO then agreed to keep working with "Jeffrey" and his associates.  The chat continued with more remote laptop setup related topics.

44.     On February 15 and 17, 2025, RAPALO and "Jeffrey" discussed sending a laptop back to victim Company #4 under the name "Jeff [D.W.'s true last name]."  In the following days, they also discuss receiving a laptop from Company #4 (the laptop that HSI sent with a tracker).

45.  On February 24, 2025, RAPALO asked "Jeffrey" if she had to sign for the laptop, and "Jeffrey" says she did.  RAPALO asked Jeffrey what name she should sign and Jeffrey replied, "Jeff [D.W.'s true last name].", to which RAPALO responded, "Ok." "Jeffrey" later asked if she signed with a different name and RAPALO wrote, "Nope I put

13

Jeff [D.W.'s true last name]." "Jeffrey" responded that it says it was signed by "R. Ropel," and RAPALO responded, "Nope" and "I signed under Jeff for sure." The chat continued as "Jeffrey" instructed RAPALO how to attempt to log in to the computer with D.W.'s credentials.

* * *

46. Based on my knowledge, training, and experience, there is probable cause to believe that from in or about November 25, 2024 until March 6, 2025, Keyla RAPALO and others did knowingly and intentionally conspire and agree to commit offenses against the United States, specifically, did knowingly transfer, possesses, or use, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law. Specifically, I have probable cause to believe that RAPALO conspired to use D.W.'s means of identification to accept the laptop sent by HSI and that she did so with the intent to commit a fraud on Company 4 by enabling a person or persons other than D.W. to do remote work for Company 4 under D.W.'s name.

## VI.  CONCLUSION

47.  Based on the above facts, I respectfully submit that there is probable cause to believe that, from on or about November 25, 2024, through March 6, 2025, in the Northern District of California and elsewhere, Keyla RAPALO, together with at least one other person, conspired to commit identity theft in violation of Title 18, United States Code, Section 1028(a)(7), all in violation of Title 18, United States Code, Section 371.

_/s/_____

Robert Sands
Special Agent
Homeland Security Investigation
U.S. Department of Homeland Security

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this 9th day of April, 2025

_____

Honorable Lisa Cisneros
United States Magistrate Judge

15